IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHUN-SHENG YU, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-03138 |
| | § | |
| THE UNIVERSITY OF HOUSTON AT | § | |
| VICTORIA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

### I.  Introduction

Before the Court are Defendants' "Motion for Summary Judgment" [Doc. No. 34], Plaintiff's "Response in Opposition to Defendants' Motion for Summary Judgment" [Doc. No. 39], and other related responses. The Court has considered the pleadings and summary judgment evidence presented by the Parties.

### II.  Background

The Plaintiff in this case, Dr. Chun-Sheng Yu ("Yu"), is employed as an associate professor by the Defendants, the University of Houston at Victoria ("UHV") and the University of Houston System ("UH System").[1] In 2016, Yu filed this employment discrimination suit, alleging retaliation and race, age, and national origin discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Texas Commission on Human Rights Act ("TCHRA"), and the Age Discrimination in Employment Act of 1967 ("ADEA"). [Doc. No. 1].

---

[1] In Defendants' Partial Motion to Dismiss [Doc. No. 6], they argued that the UH System should be dismissed because it is not an "employer" for purposes of Title VII liability. In its corresponding Order, this Court decided that the Defendants "do not present any facts to support their claim." [Doc. No. 18]. The Court denied the motion to dismiss. The Defendants did not raise this point in their motion for summary judgment. Neither Party submitted arguments or evidence regarding whether the UH System is Yu's employer or whether it is an "employer" for purposes of Title VII. Instead, the Defendants jointly submitted their motion for summary judgment with no distinctions made or disputes raised regarding their respective roles as Yu's employer. Therefore, for purposes of this motion the Court considers the Defendants to be joint employers in its analysis.

1

Yu received his Bachelor of Arts in Economics from Hangzhou University (now Zhejiang University) in 1982, his Master of Management from Fudan University in 1984, and his Doctor of Business Administration (Management) from Mississippi State University in 1998. [Doc. No. 39-4, Ex. B]. Yu began his employment at UHV in 2000, when he was hired as an assistant professor of management at the UHV School of Business Administration ("SBA"). In 2005, Yu was promoted to the title of associate professor and was tenured. [*Id.*]. His curriculum vitae lists his teaching areas as including management and organizational behavior, comparative management, and international management. [*Id.*]. Yu's wife, Dr. June Lu, also teaches at the SBA in the field of management information systems. [Doc. No. 34-3, Ex. 7]. In 2010, Yu's wife was promoted from associate professor to full professor at the recommendation of the SBA's Dean Farhand Niroomand ("Niroomand"). [Doc. No. 34-2, Ex. 6 at 14:2-25].

In his original Complaint, Yu alleges that he began experiencing discrimination based on his national origin when Niroomand became dean of the SBA in 2009. His claims span from 2009 to 2017. Yu specifically alleges that he was denied travel funds for conferences or not compensated for them at the same rate as other faculty; that professors from other national origins were promoted to full professor instead of him; that Niroomand deducted points from him and other Chinese faculty on their 2011 annual evaluations; that he received lower merit pay raises than non-Asian faculty due to this low annual evaluation; and that since complaining about the alleged discrimination, his treatment by Niroomand has worsened. [Doc. No. 1 at 3-5]. In his deposition, Yu alleged that Niroomand was originally the source of discrimination and retaliation against him, but that he further complained about the manner in which the administration at the university handled his grievances against Niroomand. [Doc. No. 39-14, Ex. L, 100:8-17].

Yu filed a charge of discrimination against UHV with the Equal Employment Opportunity Commission ("EEOC") on November 5, 2012. [Doc. No. 1, Ex. A]. He received a Right to Sue Notice from the EEOC on July 25, 2016 and filed this action on October 24, 2016. [Doc. No. 1, Ex. B].

The Defendants deny discriminating or retaliating against Yu. They dispute that Yu was treated differently than faculty members of other races, and allege that to the extent that Yu was not promoted, the decision was based on his lack of qualifications. They further contend that Yu's treatment, if it was adverse, could not have been causally linked to his national origin because the Defendants employ a diverse full-time faculty at the SBA—a majority of which are of Chinese or other Asian/Pacific Islander descent—and that during the years about which Yu complains, they promoted several Chinese faculty members at Niroomand's recommendation.

The Court has already dismissed Yu's claims under the TCHRA and ADEA. [Doc. No. 18]. It also dismissed Yu's claim for punitive damages. [Doc. No. 32]. Pending before the Court are Yu's remaining Title VII national origin discrimination and retaliation claims.

## III.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the court should not grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986). The nonmovant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

In considering the evidence presented by the parties, the Fifth Circuit has made clear that "unsubstantiated assertions are not competent summary judgment evidence" and that "[s]ummary judgment . . . may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993).

The standard for granting summary judgment in a Title VII case has been well established by the Supreme Court in the cases following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). This is not an "onerous burden"—the plaintiff "must prove by a preponderance of the evidence that []he applied for an available position for which []he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 253. If an employer fails to present evidence against this presumption, the court must enter summary judgment for the plaintiff. *Id.* at 254.

"Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804). This burden "is one of

production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). The defendant does not need to prove that its proferred reason was the actual motivation, but its explanation "must be legally sufficient to justify judgment" for the employer. *Burdine*, 450 U.S. at 255.

If the defendant provides such a reason, the burden shifts again: "[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). A plaintiff can succeed in this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Id.* at 256.

The Supreme Court has noted that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. Restated, "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor*, 509 U.S. at 519.

## IV.    Analysis

The primary questions before the Court are whether Yu is entitled to relief on his national origin discrimination or retaliation claims under Title VII. Prior to discussing those issues, however, the Court will first consider whether the statute of limitations set forth under Title VII preclude consideration of some of the years discussed in Yu's pleadings.

### A.  Statute of Limitations

In order to bring an actionable Title VII claim, a plaintiff must meet the administrative exhaustion requirements within the deadlines set forth in 42 U.S.C. § 2000e-5(e)(1). *Newton v. Securitas Sec. Servs., USA, Inc.*, 250 F. App'x 18, 20 (5th Cir. 2007) (stating this section "is a charge filing provision that specifies with precision the prerequisites that a plaintiff must satisfy before filing suit" (quoting *Jenkins v. Cleco Power LLC*, 487 F.3d 309, 313-12 (5th Cir. 2007))). In states such as Texas, which provide a state administrative mechanism to address claims of employment discrimination, a Title VII plaintiff "must file a charge of discrimination with the EEOC within 300 days after learning of the conduct alleged." *Id.*

A party must file within 300 days of the date of the act in question "or lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Discrete discriminatory acts are not actionable if they are time barred, that is, if the actions complained of fall outside of the 300-day window. *Morgan*, 536 U.S. at 113. As such, each discriminatory act "starts a new clock for filing charges alleging that act." *Id.* For claims of discrete discriminatory or retaliatory actions, the "act 'occurred' on the day that it 'happened.'" *Id.* at 110. The Supreme Court has further interpreted the term "practice" with regard to employment actions as "a discrete act or single 'occurrence,' even when it has a connection to other acts." *Id.* at 111. Discrete acts, therefore, such as "termination, failure to promote, denial of transfer, or refusal to hire," must fall within the 300 days prior to filing charges with the EEOC to be actionable. *See id.* at 114. Such an application of the statute of limitations would substantially limit the alleged actions the Court could consider, as Yu complains of conduct from 2009 to 2017.

Plaintiff contends that the Court can consider the entirety of his complaints, pointing to a 1981 decision from the Fifth Circuit, *Gupta v. E. Tex. State Univ.*, 654 F.2d 411 (1981), which allowed for an exception to the exhaustion rule where the retaliation claim grew out of the earlier

6

charge.[2] The *Gupta* exception is limited only to exhaustion of retaliation claims, however, and does not include discrimination claims: "The *Gupta* exception allows a plaintiff to proceed in district court on an unexhausted retaliation claim if that claim is alleging retaliation for properly bringing an exhausted claim before the district court." *Sapp v. Potter*, 413 F. App'x 750, 752-53 (5th Cir. 2011) ("Because the *Gupta* exception is premised on avoiding procedural technicalities, it has been applied to retaliation claims alone . . ."); *see also Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 273-74 (5th Cir. 2013) ("But this court has not applied the *Gupta* exception to claims in which both retaliation and discrimination are alleged . . . [o]therwise, Simmons-Myers would be required to return to the EEOC and exhaust her administrative remedies with respect to her discrimination claim, while proceeding with litigation on her retaliation claim.").

As a second justification, Yu provides citations to several other cases from the 1960s through the 1990s in support of his claim that all his discrimination and retaliation claims from 2009 to 2017 are part of a "continuing pattern" and should properly be considered by this Court. This claim is unavailing. The Fifth Circuit held in a similar case involving questions of promotion and demotion that the employer's failure to promote was an isolated occurrence, and as such, was a discrete adverse action that should have put that plaintiff on notice that a claim had accrued. *Huckabay v. Moore*, 142 F.3d 233, 239-40 (5th Cir. 1998). Courts within this circuit have reaffirmed that discrete actions cannot constitute grounds for a continuing violation claim and extension of the statute of limitations. *Cf. Mack v. John L. Wortham & Son, L.P.*, 541 F. App'x 348, 355 (5th Cir. 2013) ("Thus, though the effects of an allegedly discriminatory act

---

[2] Yu's arguments do not discuss the impact of the Supreme Court's *Morgan* decision in 2002 on the *Gupta* exception. The Fifth Circuit has acknowledged the possibility that *Gupta* may no longer be applicable in light of *Morgan*. *Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 273 n.1 (5th Cir. 2013). This Court declines to answer whether *Gupta* is still good law after *Morgan* and will consider evidence as favorably to the non-movant as possible within the statute of limitations.

may persist, a claim based on that act is not actionable under Title VII if the act occurred more than 300 days before the charge was filed."); *Hutcherson v. Siemens Indus., Inc.*, No. 3:17cv907TSL-RHW, 2018 WL 4571908, at *3 (S.D. Miss. Sept. 24, 2018) ("The continuing violation doctrine does not apply to the acts at issue here, failure to promote and demotion, which, as a matter of law, are discrete acts."). Accordingly, the continuing violation doctrine does not apply to Yu's claims, which are discrete actions, and the Court will not extend the statute of limitations for his claims.

Therefore, because Yu filed his EEOC claim on November 5, 2012, only allegedly discriminatory and retaliatory acts on or after January 20, 2012 are actionable. In addition, to the extent that Yu's claims are based on discrete actions that occurred after November 2012, those claims are also subject to dismissal because he did not file a new or amended EEOC claim to exhaust such claims. *See Morgan*, 536 U.S. at 110; *Simmons-Myers*, 515 F. App'x at 273-74.

Once the statute of limitations is applied by looking back 300 days, the following allegations regarding Yu's discrimination claim remain actionable:

- In 2012, Yu began the application process for promotion and withdrew his application. His failure to promote and futile gesture claims regarding this 2012 application remain before the Court.

- The annual evaluation used to determine Yu's 2012 salary, which was paid during the actionable time period, and any discriminatory action regarding his evaluations or pay during 2012 are actionable.

The following facts remain for Yu's retaliation claim as exhausted by his 2012 EEOC charge or arising out of that exhausted charge:

- In 2013, Yu completed the application process for promotion to full professor but was not promoted. His 2013 application remains before the Court for review.

- Yu's annual evaluations used to determine his 2012 and 2013 salaries and merit pay increases will be reviewed for any issues of material fact regarding retaliation for Yu's alleged protected activities.

- Any adjustments to Yu's teaching location assignment or travel award funding within a reasonable time after Yu's EEOC charge (namely, within 2012-2013) will also be addressed.

All other claims are barred by the statute of limitations or Yu's failure to exhaust his claims.

### B. Evidentiary Issues

Before turning to the substance of Yu's claims, the Court will also briefly address the evidentiary issues that appear throughout this case. The first involves the admissibility of Yu's evidence. The amended version of Federal Rule of Civil Procedure 56, as explained in the commentary to the 2010 Amendment, states that "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, advisory committee note 2010 amend.; *see also Valentine v. Hodnett*, No. 5:14-cv-72, 2015 WL 12942069, at *3 (S.D. Tex. Sept. 16, 2015). The adverse party must provide competent summary judgment evidence to demonstrate the existence of an issue of material fact. Yu has supplied personal statements, letters, emails, university records, deposition testimony, and the letters and documents comprising his EEOC charge and subsequent responses. The overwhelming majority of this purported evidence is inadmissible and cannot be used to defeat summary judgment because the documents are unauthenticated, do not contain affidavits attesting to their contents, or do not indicate that they were "made on personal knowledge" as required by Federal Rule of Civil Procedure 56(c)(4).

The admissible exhibits in Yu's proposed summary judgment evidence are limited to

- Exhibit L: Deposition of Dr. Chun-Sheng Yu (Doc. No. 39-14, Ex. L)
- Exhibit O: Dr. Chun-Sheng Yu's Declaration re: Promotion to Full Professor (Doc. No. 39-17, Ex. O)
- Exhibit P: Dr. Chun-Sheng Yu's Declaration re: Publications List (Doc. No. 39-18, Ex. P)

Additionally, Exhibit O only involves an unexhausted claim regarding Yu's 2017 application for promotion and is irrelevant to his exhausted claims. Effectively, the Court is limited to Yu's sworn statements in his deposition and his list of publications that he has provided under oath.

With regard to the contents of Yu's EEOC file, the Fifth Circuit has made clear that unsworn contents do not meet the requirements of Rule 56(c). *Cruz v. Aramark Servs., Inc.*, 213 F. App'x 329, 332-33 (5th Cir. 2007) ("[W]hile the EEOC report may fall within the business records hearsay exception, the same cannot be said of the entire EEOC *file*. The business records hearsay exception applies to the EEOC's report and determination, but it does not apply to the underlying material collected during the EEOC investigation."). Here, Yu has not submitted the EEOC's findings or determinations of any investigation. Instead, Yu has submitted his charge, the Defendants' response to the allegations, and Yu's reply to the Defendants' defenses. [*See* Doc. No. 39-15, Ex. M]. None of these alleged correspondences are submitted in compliance with the Federal Rules of Evidence. No one has attested to their contents, authenticity, or that they were compiled with personal knowledge.[3] Therefore, the EEOC documents submitted by Yu are not competent summary judgment evidence. *Aramark Servs., Inc.*, 213 F. App'x at 333.

The second evidentiary issue arises out of Yu's failure to cite to specific evidence in his summary judgment response. A district court is not prohibited from considering evidence not specifically cited to in the briefing, however, the Fifth Circuit has made clear that "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment, especially where, as here, the nonmoving party is well aware of the existence of such evidence. Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the

---

[3] The Defendants have submitted their responses to the EEOC charge [Doc. No. 34-1, Ex. 2], which were properly authenticated under the business records exception. [*See* Doc. No. 34-4, Ex. 35].

record, that creates an issue of fact." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992); *see also Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988).

In Yu's briefing opposing summary judgment, he only cited to five instances of specific admissible evidence to support his claims:

- Yu cites to his deposition to support the proposition that he "has seen a doctor to cope with his emotional distress caused by these events . . . ." [Doc. No. 39 at 3; Doc. No. 39-14 at 119:4-25; 120:1-25; 121:1-25; 122:1-25; 123:1-25; 124:1-25; 125:1-15; 135:17-24; 146:13-25; 147:1-5].
- Yu cites to his deposition for the proposition that he applied multiple times to receive a promotion to full professor. [Doc. No. 39 at 7; Doc. No. 39-14 at 15:7-10].
- Yu cites to his deposition to demonstrate his belief that Niroomand must have known about his internal complaints (although this testimony may be conclusory or speculative). [Doc. No. 39 at 8; Doc. No. 39-14 at 27:11-28:4].
- Yu cites to university records authenticated by a declaration to support claims about his 2017 application for promotion, which falls outside the statute of limitations. [Doc. No. 39 at 13, Doc. No. 39-17, Ex. O].
- Yu cites to a list of his publications authenticated by a declaration to support a claim that he was the second highest cited professor at UHV, however, the exhibit to which he cites only provides a list of his publications without any additional discussion or comparisons to other faculty members at UHV. [Doc. No. 39 at 13; Doc. No. 39-18, Ex. P].

Although the Court is under no obligation to search in the record, it still provides a thorough overview of the claims and supporting evidence to determine if summary judgment is appropriate. The Court will also add that had it considered all of offered exhibits, even in their unproven and inadmissible form, it would reach the same conclusion that Yu's "evidence" does not raise an issue of material fact.

### C. Title VII National Origin Discrimination Claims

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a prima facie case of national origin discrimination under Title VII, Yu must show that (1) he is a member of a protected group; (2) he was qualified for the position; (3) he was discharged or suffered another adverse employment action; and (4) he was replaced by someone outside his protected group or the adverse employment action was due to the plaintiff's membership in the protected class. *Harrison v. Corr. Corp. of Am.*, 476 F. App'x 40, 43 (5th Cir. 2012).

The Defendants argue that Yu cannot meet the prima facie burden for elements 2, 3, and 4, arguing that Yu did not apply for the full professor position during the time period at issue, and that even if he had, he was not qualified for the promotion. Defendants further contend that Yu did not suffer an adverse employment action and cannot show that an adverse employment action occurred because of his Chinese national origin.

### i. *Element 2: Qualifications for the Position*

There is some disagreement regarding Yu's qualifications for promotion to full professor. This disagreement is not material to Yu's ultimate discrimination claim because he did not apply for the promotion during the years at issue. The Court will briefly discuss the nature of the disagreement, however, because the context regarding Yu's decision to apply and his qualifications is relevant to his claim that it would be futile to apply for a promotion. The disagreement about Yu's qualifications stems from Yu's opinion that the criteria used to evaluate his applications were unfair. The Parties do not contest, however, that this set of criteria was used to consider his application for promotion.

Both parties agree that in 2011, when his performance evaluation, which would impact a 2012 promotion application, was completed, Yu was subject to the Faculty Development &

Evaluation Plan 2011 ("FDEP 2011"). This plan was approved by the SBA faculty by a vote of 20 to 6 with 2 abstentions in May of 2010. [Doc. No. 39-15, Ex. M]. The FDEP 2011 laid out a rubric for faculty annual evaluations within the areas of teaching, research, and service, each of which was based on a variety of factors. [Doc. No. 34-3, Ex. 13]. Each area would be graded on a scale of 1 – 5. For annual evaluations, the score for the research component depended on the number of publications, the quality of the journal in which the professor published, and the order of authorship, i.e., if the faculty member was listed as first, second, etc. on the list of authors. For example, being listed as first author in an elite journal would receive 8 points, while being listed as second author in a quality journal would be awarded 3 points. [Doc. No. 34-3, Ex. 13].[4]

The FDEP 2011 separately identifies the minimum requirements for promotion from associate to full professor, which also focus on the quantity and quality of publications produced by the applicant. [Doc. No. 34-3, Ex. 13]. Specifically, the requirements for promotion call for an average evaluation score of 4 in research ratings and teaching ratings during the applicant's time as an associate professor, plus one of the following: "a) Four articles in journals regarded as quality and above, b) Three articles in journals regarded as quality and 2 [others published in] listed [journals],[5] c) Three articles in high quality journals, d) One article in an elite journal and two articles in quality journals." The rubric adds additional requirements for applying in any year other than the 6th year as an associate professor, all of which involve an additional type of publication requirement. [*Id.*].

The minimum requirements for promotion include several other relevant requirements. The rubric specifies that "[a]ll articles must be in the faculty's teaching area. However, one of

---

[4] The FDEP 2011 defines quality, high quality, and elite journals based on two outside rating systems, known as the Harzing list and ABC list, which rank journals within the field of business. In the event that a professor published in a journal which received conflicting rankings in these two systems, the professor would receive the higher possible rating for his/her evaluation. [Doc. No. 34-3, Ex. 13].

[5] The "listed" journals are those included on the Harzing and ABC list, discussed *supra* note 2.

the articles can be in multidisciplinary area related to faculty's teaching field." Next, the rubric maintains that "[a]t least one article must be first authored and at least two articles must be second authored in quality and above journals." It allows for an exception if the candidate published a book, in which case the requirement changes to "at least one article must be first authored and at least one article must be second authored in quality and above journals." [Doc. No. 34-3, Ex. 13].

The Parties disagree, not about whether the FDEP 2011 applied to Yu, but whether Yu met the minimum requirements for promotion. The Court notes that Yu also disputes whether the FDEP 2011 was a fair standard. Yu contends that he was qualified for a promotion because of his annual performance evaluation scores, his total number of publications, and the number of times his publications have been cited by other authors. In his briefing, Yu refers to his Google Scholar page to claim that he is the second most highly cited professor at UHV. [Doc. No. 39 at 13]. He also mentions in his deposition that he published more articles than other faculty seeking promotions. [Doc. No. 34-2, Ex. 6 at 73:15-19]. Indeed, both sides have offered the Google Scholar page in support of their arguments, but neither proved it up according to the rules. Neither Party has submitted competent (authenticated) summary judgment evidence of Yu's Google Scholar page. This document is the only source documenting the number of times Yu's publications have been cited; however, it cannot be considered because it is not admissible.

The Court is limited to the publication list submitted by Yu—sworn under oath—which shows that by 2012, Yu was an author on twenty "refereed journal articles." [Doc. No. 39-18, Ex. P]. Of those twenty, Yu was first author of two articles, published in 2000 and 2006; second author of five articles;[6] third author of thirteen articles; and fourth or later author of three articles.

---

[6] Each of those five articles fall within the topic of management information systems and have Dr. June Lu, Yu's wife, listed as the primary author. [Doc. No. 39-4, Ex. B].

Yu offered commentary on the significance of order of authorship and quality of journal in his deposition. Yu agreed that, while some academic articles may indicate that all authors shared equal responsibility, [*See* Doc. No. 34-2, Ex. 6 at 37:16 – 38:19], in most instances the order of authorship corresponds with the level of contributions to the article:

> Q      Okay. So the first person's name as first author is the author that has made the most substantial contribution, that came up with the idea for the article, that probably developed theories and support, et cetera, et cetera, the first author was the person that contributed the most to the article, correct? The first person's name that's listed?
> A      Generally speaking, yes.
> Q      Is that correct?
> A      Yeah.

[Doc. No. 34-2, Ex. 6 at 33:13-22].

With regard to journal rankings, Yu explained that "it's kind of a definition issue. Some schools will define some journal as a high quality, some quality. In our school we have a specific committee to rank the journals." [Doc. No. 34-2, Ex. 6 at 44:9-12]. As Yu confirmed, the rankings go from top to bottom: elite, high quality, then quality. [*Id.* at 43:20-44:18]. Yu identified that his 2006 first-authored article was published in a quality journal. [*Id.* at 41:24-42:24]. Yu admitted his pre-2004 publications would not be considered for a promotion from associate professor to full professor because they were already considered for his original promotion from assistant to associate professor in 2004. [*See id.* at 48:10-49:24]. As Yu conceded, from 2005 to 2012, he had not been published as a first author in an elite or high quality journal, and only published one article as first author in a quality journal to be considered for his application to full professor. [*Id.* at 51:1-52:4].[7]

In addition to questions about the number of publications, Defendants claim that most of Yu's publications cannot be considered for a promotion application because they fall outside of

---

[7] Yu was published as first author in a quality journal in 2013, which is why he indicates that he was first author in a quality journal twice since 2005 in his deposition. [*See* 34-2, Ex. 6 at 51:17-52:4]. This article was published after he filed his EEOC complaint which underlies this lawsuit.

his teaching area and instead related to management information systems, a subject Yu never taught at UHV. [Doc. No. 34-3, Ex. 14]. The Promotion and Tenure Rules section of the FDEP 2011 states that "[a]ll articles must be in the faculty's teaching area . . . one of the articles can be in multidisciplinary area related to faculty's teaching field." [Doc. No. 34-3, Ex. 13]. Yu's unsworn evidence lists the courses he taught at UHV: International Management, Principles of Management, Organizational Behavior, Management and Organizational Behavior, and Comparative Management. [Doc. No. 39-3, Ex. A; *see also* Doc. No. 34-3, Ex. 9].[8] Although Yu appears to have minored in management information systems while studying for his doctorate, there is no evidence that he taught a course in this topic at UHV. [*See* Doc. No. 39-12, Ex. J]. Yu contends that all his articles should count toward the promotion publication requirements.

The Fifth Circuit has reaffirmed that employers may establish the criteria for hiring and promotion decisions. *Deines v. Tex. Dep't of Protective & Reg. Servs.*, 164 F.3d 277, 282 (5th Cir. 1999) ("As our precedents have made clear . . . the employer's judgment as to qualifications will not be probative of the issue of a discriminatory motive unless the qualifications are so widely disparate that no reasonable employer would have made the same decision."); *see also Scales v. Slater*, 181 F.3d 703, 711 (5th Cir. 1999) (finding the employer Federal Aviation Agency was within its rights to adjust its standard promotion criteria for candidates to a specific position in the context of a Title VII race discrimination claim). Yu's disagreement with how his employer should have defined his teaching area or classified the journals in which he published does not change the standards for promotion that applied to his application for promotion. The Court finds that, as a matter of law, Yu has not met his burden to show he was qualified for promotion under these neutral standards to meet his prima facie case of discrimination. The

---

[8] Yu's summary judgment evidence submitted to prove this assertion is limited to an unsworn personal statement, and as such, is hearsay. The Defendants have submitted uncontested evidence under the business records exception showing Yu's teaching assignments, which confirms the list of courses that Yu provided.

Court will continue, however, to discuss each element to demonstrate that even if Yu was qualified for promotion, summary judgment would still be appropriate.

*ii. Element 3: Adverse Employment Actions*

In the context of a discrimination claim, the Fifth Circuit, in accordance with the language of Title VII, "only recognizes ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating as actionable adverse employment actions." *Harrison*, 476 F. App'x at 43 (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (2007)). Here, Yu's claims include alleged discriminatory acts such as failure to promote, failure to give pay increases, giving low evaluation scores, awarding lower travel funds, and requiring Yu to teach at the Victoria campus. For purposes of a Title VII discrimination claim, the only actionable claims are the failure to promote and failure to give pay increases.[9] As previously stated, the plaintiff's burden at this stage is not an "onerous burden"—the plaintiff "must prove by a preponderance of the evidence [or in the summary judgment context that there are issues of material fact to support the proposition] that []he applied for an available position for which []he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 802). Assuming Yu was qualified for a promotion and merit pay increases, the Court will turn to whether any of these alleged adverse actions were causally linked to Yu's national origin.

*iii. Element 4: Adverse Actions Must Be Due to Membership in the Protected Class*

1. Failure to Promote

---

[9] The other employment decisions, which are non-ultimate—evaluation scores, travel awards, and teaching location assignments—will be discussed later in the context of Yu's Title VII retaliation claim.

As discussed, Yu alleges that he was qualified for promotion and that the failure to promote him was based on Niroomand's discrimination against his Chinese national origin. Yu's summary judgment evidence, however, shows that he did not apply for the position during the actionable time period. He claims that he was deterred from applying because Niroomand would not support his promotion, and that he could not be promoted without Niroomand's support. [Doc. No. 39-14, Ex. L at 60:1-6]. Since he never actually applied, Yu suggests that his failure to promote claim should still be considered under the futile gesture doctrine.

In his deposition, Yu described beginning the application process for promotion in 2009, 2010, and 2011 but said that he ultimately withdrew his application for each of those years. [*See* Doc. No. 34-2, Ex. 6 at 15:1-32:25]. Although he does not explicitly state this, the Court can only assume that he offers this evidence to show that Yu believes applying in 2012, the actionable time period, would have been a futile gesture. In 2009, Yu had applied for promotion at the same time as his wife, Dr. June Lu, and withdrew his application at Niroomand's suggestion. Yu said the explanation given to him was that applying as a couple at the same time might become a problem with the university. [*See id.* at 15:20-16:3]. His wife was successfully promoted and received the title of full professor in 2010. [*See* Doc. No. 34-3, Ex. 7]. In 2010, Yu also withdrew his application at the suggestion of Dr. Sardessai, the associate dean. [Doc. No. 39-14, Ex. L at 16:9-20; 21:1-22:23]. Yu claims that Niroomand had asked Sardessai to tell him to withdraw his position, however, this hearsay evidence cannot properly be considered. [*Id.* at 16:9-20]. He also claims that Sardessai promised to help him in the subsequent year, a claim which also cannot factor into the Court's decision. [*Id.*]. Yu has not submitted any additional documentation or evidence concerning these years.

In 2011, Yu withdrew his promotion application, which he apparently documented in an email to Niroomand, but neither party submitted this evidence. [*See* Doc. No. 34-2, Ex. 6 at 24:20-25:7]. While there is no evidence concerning this email, Yu explained in his deposition that he and two other Chinese faculty members had complained about Niroomand's behavior and "wrongdoing" during the summer of 2011 in person to SBA Provost Jeff Cass, and as a result, it was Yu's opinion that Niroomand would not support his promotion to full professor. [*Id.* at 25:11-26:3]. Yu described his perception of the situation: "Starting from 2009, I believe I was qualified for full professor. Honestly, I influenced my decision [sic] to apply or whatever is Dr. Niroomand, because he was in the dean position and then his attitude is determinant. And usually, you know, in university, dean -- if the dean doesn't support you, you will not get promoted." [Doc. No. 39-14, Ex. L at 60:1-6]. Yu submitted no other evidence regarding his withdrawn applications from 2009-2011.

The Supreme Court has described that the futile gesture doctrine exists to protect the "victims of the most entrenched forms of discrimination" where discrimination could be so extensive as to deter minority groups from even applying to be hired or promoted. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977). In order to prevail, a plaintiff who did not apply "must show that he was a potential victim of unlawful discrimination," which carries with it "the not always easy burden of proving that he would have applied for the job had it not been for those practices." *Id.* at 368; *see also Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 150 (5th Cir. 1978) ("A consistently enforced discrimination policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection."). In the Fifth Circuit, such a claim requires showing "a known and

consistently enforced policy of discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406 (5th Cir. 1999).

Courts within this circuit have found that comments from an employer or supervisor suggesting that applying will not be successful is not enough to establish a "known and consistently enforced policy of discrimination." *See, e.g., Frensley v. N. Miss. Med. Ctr., Inc.*, No. 1:09-cv-118-SA-JAD, 2010 WL 3655860, at *9 (N.D. Miss. Sept. 9, 2010) ("Plaintiff testified that [her supervisor] told her it would 'do [her] no good to apply' for the new positions . . . [t]his is not sufficient to show a 'known and consistently enforced policy of discrimination.'"). The Fifth Circuit has gone further to find that even where an employer approached "who they wanted for the positions and filled them," it is not enough for the futile gesture doctrine without additional evidence. *See Irons v. Aircraft Servs. Int'l, Inc.*, 392 F. App'x 305, 311-13 (5th Cir. 2010).[10] Indeed, Yu's wife, also of Chinese origin, was promoted during that time period.

Yu's only proferred evidence regarding the futility of an application are his unsubstantiated assumptions and conclusions in his deposition transcript.[11] The Fifth Circuit has made clear that bare assertions from deposition testimony, without evidence supporting the claims made during the deposition, are insufficient at the summary judgment stage. *Garrison Prop. & Cas. Co. v. Silva*, 652 F. App'x 240, 242 (5th Cir. 2016); *Forsyth*, 19 F.2d at 1533

---

[10] In a parallel lawsuit filed by a fellow associate professor at UHV regarding a similar failure to promote at the hands of Niroomand, another judge of this Court has already summarily dismissed that plaintiff's discrimination claim for failing to apply to the position and "not even attempt[ing] to show that the reason he failed to apply for the position of full professor is because it would have been futile due to a 'known and consistently enforced policy of discrimination.'" *Du v. Univ. of Hous. at Victoria*, No. 4:16-cv-3141, 2018 WL 1939503, at *6 (S.D. Tex. Apr. 5, 2018).

[11] These statements in his deposition are as follows: "And later I knew Dr. Jeff Cass told Dr. Niroomand all about that, so I thought at this situation I had no way to get like support from Dr. Niroomand, so I thought that I just withdraw this application then." [Doc. No. 39-14, Ex. L at 26:2-6]. "Q: [A]t which time it's your opinion or your assumption that [your internal complaint] was somehow going to influence Dr. Niroomand's decision in your promotion to full professor? A: It's my opinion. . . ." [*Id.* at 28:21-25]. "Starting from 2009, I believe I was qualified for full professor. Honestly, I influenced my decision [sic] to apply or whatever is Dr. Niroomand, because he was in the dean position and then his attitude is determinant. And usually, you know, in university, dean -- if the dean doesn't support you, you will not get promoted." [*Id.* at 60:1-6].

("[U]nsubstantiated assertions are not competent summary judgment evidence."); *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."); *Jones v. Lowndes Cty.*, 678 F.3d 344, 348 (5th Cir. 2012) ("However, the non-movant cannot avoid summary judgment simply by presenting '[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation.'" (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002))); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (a non-movant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence).

The only actual admissible evidence in the record is from the Defendants, who submitted uncontroverted evidence, establishing that even if Yu had applied, Niroomand's recommendation was only one of several steps during consideration for promotion, and therefore could not have been a determinative factor if Yu had applied. The Defendants refer to the FDEP 2011's stated procedure for determining promotions through the Promotion & Tenure Committee, which states: "All decisions for promotion to full professor will be reviewed by all full professors in the department. School Advisory Committee (SAC) members should vote only once, at either the departmental or the school level. All exceptions will be handled case by case by the Dean. In the first year of this document's [FDEP 2011] existence, any case falling outside the purview of this document will be mitigated by the dean." [Doc. No. 34-3, Ex. 13].

The uncontroverted evidence also shows that between 2009 and 2017, Niroomand supported and recommended four Chinese faculty members for promotion to full professor,

including Dr. June Lu, Yu's wife. [Doc. No. 34, Exs. 3, 14]. Additionally, the summary judgment evidence demonstrates that Niroomand hired 11 of the 17 full-time Chinese faculty at the SBA [Doc. No. 34-1, Ex. 3], and that Niroomand hired 9 full-time Asian faculty members out of 16 full-time hires made during his tenure. [Doc. No. 34-1, Ex. 2]. During the time period at issue, 54.8% of the full-time faculty at the SBA identified as Asian/Pacific Islander. [*Id.*].[12]

The evidence conclusively shows that Yu was not deterred from applying because of a known and consistently enforced policy of discrimination against individuals of his national origin.[13] These unsubstantiated and conclusory claims are insufficient as a matter of law to demonstrate that his application would be a futile gesture because of a known, consistent policy of discrimination; accordingly, Yu has failed to raise an issue of material fact under this doctrine. Additionally, because Yu has not demonstrated that applying for the position would have been a futile gesture, Yu's failure to apply for promotion during the actionable time period negates his discrimination claim for failure to promote. Yu's claims have been offered without evidence supporting his assertions and are insufficient to establish a prima facie case, much less pretext in response to Defendants' preferred legitimate, non-discriminatory reasons. There is no issue of material fact to support a claim that Yu's failure to be promoted is the result of discrimination.

## 2. Failure to Give Pay Increases

Yu alleges that he received lower evaluation scores because of his national origin, and that as a result, he received lower merit pay increases. Yu provided no admissible support for this claim. He submitted two documents that, without authentication or other proof, are hearsay and

---

[12] In 2012, the SBA faculty included 42 full-time faculty members, of which 54.8% were Asian/Pacific Islander, 33.3% White/Other, 7.1% Hispanic, and 4.8% African-American. [Doc. No. 34, Ex. 2].

[13] Yu argues that two other Chinese faculty members, Drs. Ren and Du, are the correct standard of comparison, as they also complained about Niroomand and were not promoted. However, Yu submits no evidence regarding these faculty members' qualifications or whether they even applied for promotion. As such, the Court cannot address this argument, which is not supported by the facts in the record.

thus not competent summary judgment evidence. The Court addresses the evidence, however, to demonstrate that even if the Court considered the purported evidence, the outcome would be the same. To support his claim, Yu submitted hearsay documents indicating the amounts of merit pay increases he received between FY 2014 to FY 2017. [Doc. No. 39-10, Ex. H]. His evidence does not include the actionable time frame. All Yu provided in relation to the actionable time period was his own statements in his original EEOC charge, a hearsay document, that his 2011 annual evaluation score was lower because of Niroomand's discretionary adjustments, and as such, that he received lower merit pay increases. [Doc. No. 1, Ex. A; Doc. No. 39-15, Ex. M]. One of those point adjustments involved attendance at commencement. Yu claims that 22 of 38 faculty members did not attend commencement, and of those 22, only 5 were deducted points on their evaluations for failure to attend. [Doc. No. 39-9, Ex. G]. Yu claims that these 5 faculty were all Chinese.[14] [*Id.*]. None of the documents that Yu provided have been sworn to or proven through any method; they are all hearsay.

In response, Defendants have provided uncontroverted evidence regarding their method of calculating merit pay and evidence of what merit increases were awarded to the full-time faculty. UHV asserts: "SBA faculty are evaluated annually in accordance with UHV policy regarding annual performance evaluations for faculty . . . Annual performance evaluations are used to provide feedback so that faculty members know their overall performance and whether satisfactory performance has been achieved . . . When there is merit money available, faculty

---

[14] The Defendants offered potentially conflicting evidence in their response submitted to the EEOC, in which they state that the following faculty members received deductions within the teaching or service categories: "Drs. Vera Adamchik (54, originally from Belarus), Omar Al-Nasser (33, from Jordan), Joseph Ben-Ur (73, from Israel), Peggy Cloninger (54, from U.S.), Yong Lee (59, Korean), Nags Ramamoorthy (53, from India), Rupak Rauniar (41, from Nepal), Rajan Selvarajan (India), Donna Stringer (49, from U.S.), and Ziad Swaidan (53, from Palestinian territory)." [Doc. No. 34-1, 2]. Since this information includes those who received deductions for teaching as well as service, if accurate, it is unclear whether Yu's claims that the only ones who received service deductions were Chinese are incorrect. As discussed later, this potential fact dispute is not material to the resolution of Yu's ultimate claims.

who perform well in their annual evaluations are eligible for merit pay. . . ." [Doc. No. 34-1, Ex. 1]. The UHV faculty handbook states that annual performance reviews are used to provide feedback, determine whether satisfactory performance was achieved, and determine merit pay distributions, if available. [Doc. No. 34-3, Ex. 17]. It continues:

> Annual performance evaluations do not address:
> a.    consequences of substandard performance, a critical concern in the case of annual performance evaluations
> b.    the relationship between annual performance evaluations or merit pay evaluations and promotion and tenure evaluations. [*Id.*].

The FDEP 2011 plan approved by the faculty allowed the dean to award or subtract discretionary points (between -5 and +10) in the service category "based on the quality of service, time spent, number of meetings, commitment shown, contributions made and in general the over and above the required minimum service activities." [Doc. No. 34-3, Ex. 3].

Although these evaluations were given in 2011, which falls outside of the statute of limitations for Yu's claims, the SBA revised these evaluation scores within the actionable time period, in June 2012, to address concerns regarding these adjustments. In this revision, Provost Cass eliminated the attendance deduction by rescinding the dean's discretionary award of points. [Doc. No. 34-4, Ex. 24]. Cass explained in an email to the faculty on June 22, 2012 (evidence which was submitted by all Parties):

> Last year's faculty evaluations will be recalculated without the dean's discretionary deductions. This does not mean that I don't believe the dean has discretion in these matters; indeed, the Faculty Handbook suggests it. But perhaps not everyone understood last spring how and under which circumstances these deductions might occur. Therefore, it is my conclusion that this approach lacked as broad a faculty consent and notification as one might ideally wish. So we shall reset the averages to include only the FDEP scores from the faculty committee. Thus, the final evaluation score for any faculty member will be the faculty committee score. [*Id.*].

In particular, the evidence demonstrates that the university ensured that the recalculation would not penalize faculty members—scores would only go up. [*Id.*]. Defendants submitted

uncontroverted evidence that faculty other than Niroomand conducted Yu's annual evaluations in the subsequent years. [Doc. No. 34-3, Exs. 11, 12]. In his affidavit, Niroomand claims that he did not deduct any points from any of Dr. Yu's evaluations from 2012 to 2016, and that he did not instruct the evaluators to lower or raise Yu's score or that of other faculty members. [Doc. No. 34-1, Ex. 3].

Defendants additionally provided affidavit testimony to the effect that no merit pay increases were awarded in 2012 to any faculty members because there was no merit money available during fiscal year 2012. [Doc. No. 34-1, Ex. 3]. Defendants' records of merit pay increases for the fiscal years during Niroomand's tenure as dean show no merit increases in 2012 for anyone, and Yu has not contested the issue of whether merit pay was awarded in 2012. [Doc. No. 34-3, Ex. 19]. As such, the alleged controversy over faculty evaluations had no effect on what merit pay increases were awarded to which faculty during 2012.

If merit pay increases had been awarded in 2012 based on the original evaluations with Niroomand's deductions, the circumstances may have supported a claim that there at least was an inference of discrimination. The undisputed facts, however, establish that the scores were revised to raise Yu's evaluation scores and that no faculty member received a merit pay increase that year. This negates the possibility of any inference. Yu has failed to present evidence demonstrating a causal link between his 2011 evaluation score to Niroomand's alleged racial animosity toward professors of Chinese nationality or to a failure to provide a merit pay increase during the actionable time period.

In light of the foregoing law and facts, Yu has not presented evidence to meet his prima facie burden of showing an issue of material fact that his denial of promotion to full professor or that his receipt of low evaluations, and subsequently lower pay increases, were causally linked to

his membership in a protected class. The Court therefore grants Defendants' motion for summary judgment on Yu's Title VII discrimination claim.

### D. Retaliation Claim

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). For a Title VII retaliation claim, a plaintiff must show: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Thomas v. Tex. Dep't of Crim. Justice*, 220 F.3d 389, 394 (5th Cir. 2002). For a retaliation claim, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotes omitted). If the plaintiff makes a prima facie case of discrimination, and if the employer articulates a legitimate, non-discriminatory reason for the adverse action, then the burden shifts back to the plaintiff to provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Yu engaged in several actions that he contends are protected actions that were causally related to the alleged adverse employment actions he experienced. First, Yu and two other Chinese faculty members complained in person to Provost Jeff Cass over the summer of 2011 about Niroomand's "wrongdoing." [Doc. No. 34-2, Ex. 6 at 25:24-26:6, 28:9-11]. The specific

contents of this discussion are not clear from the summary judgment evidence. The relevant statements from Yu's deposition include:

- A: . . . Dr. Ren and Dr. Du and me went to Victoria to talk to the provost about what happened in our school. So we report some wrongdoing by Dr. Niroomand. [Doc. No. 39-14, Ex. L at 25:23-26:2].

- Q: . . . Dr. Ren, Dr. Du and yourself went to Provost Cass and complained about Professor Niroomand, correct?
  A: Yes. [*Id.* at 26:19-22].

There is no evidence, other than Yu's unsupported assumption, that Cass informed Niroomand of these complaints. The relevant statements in evidence are as follows:

- A: . . . And later I knew Dr. Jeff Cass told Dr. Niroomand all about that, so I thought at this situation I had no way to get like support from Dr. Niroomand, so I thought that I just withdraw this application then. [*Id.* at 26:2-6].

- Q: And then you're saying that Dr. Cass informed Dr. Niroomand of your complaints against him and for that reason you did not feel that Dr. Niroomand would support your promotion to full professor, is that basically correct?
  A: Yes, this is what I spoke. Yeah.
  Q: And you mentioned that Dr. Cass, Provost Cass, told Dr. Niroomand about your complaints. How do you know that?
  A: Hmm, Dr. Cass promised us he would talk to Dr. Niroomand about the issues we list, and generally speaking, we list the several issues, mainly something, you know, we believe this kind of behavior hurt [sic] our school, and Dr. Jeff Cass promised us he will talk to Dr. Niroomand and he will ask him to change and he told us, give me six months. I'm going to make the change. This is what he said.
  Q: Okay.
  A: And so I trusted he would talk to Dr. Niroomand about that. [*Id.* at 26:23-27:17].

- Q: Okay. So if you want to call it a report or if you want to call it a complaint, you can use either word to call it that, but you basically went and was giving information that you felt was wrongdoing by Dr. Niroomand, correct?
  A: Yes.
  Q: Okay. And then at that point you're saying that Dr. Cass told you verbally that he was going to go talk to Niroomand to stop whatever the alleged wrongdoing was, at which time it's your opinion or your assumption that that was somehow going to influence Dr. Niroomand's decision in your promotion to full professor, correct?
  A: It's my opinion. . . . [*Id.* at 12-25].

No evidence is available demonstrating that Cass ever discussed the issue with Niroomand, or, if he did, that Cass listed to Niroomand the identities of any faculty who complained about him. Neither the affidavit from Niroomand nor that from Cass contain any mention of an internal complaint from Yu or these other faculty or this conversation during 2011. [*See* Doc. No. 34-2, Ex. 3 (Niroomand), 34-3, Ex. 14 (Cass)].

Filing an internal complaint about wrongdoing by superiors is a protected activity, however, there is no evidence that Niroomand actually knew about the complaint. There is also no evidence, other than the deposition transcript excerpts above, that ever explains what the so-called wrongdoing was. In order to retaliate, one must first have knowledge of the protected activity. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003) ("[T]he employee should demonstrate that the employer knew about the employee's protected activity."); *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) ("Generally, this requires some showing that the decisionmaker—the individual 'who actually made the decision or caused the decision to be made'—was aware of the activity." (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000))). "Demonstrating that a decisionmaker was aware of an employee's protected activity requires 'more evidence than mere curious timing coupled with speculative theories.'" *EmCare, Inc.*, 857 F.3d at 683 (quoting *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997)).

Second, Yu, along with several other Chinese SBA faculty members, submitted an anonymous incident report on April 30, 2012 through the UH System's MySafeCampus website. He claims that this was his second instance of protected activity. The incident report requested that the UH System "investigate the wrong doings by the Dean Farhang Niroomand and Associate Dean Jeffrey Blodgett in the SBA, UHV" [Doc. No. 39-11, Ex. I]. Yu and the co-filers

of the report requested to remain "completely anonymous." [*Id.*]. On May 31, 2012, the group of SBA faculty members used an anonymous email address ("uhvwhistleblowers@gmail.com") to email the university chancellor, Dr. Renu Khator, to reiterate their request for an investigation [Doc. No. 39-11, Ex. I]. Yu and the other individuals also filed another MySafeCampus incident report on the same date. [*Id.*]. The first incident report mentioned Yu as one of the five faculty members who received a lower evaluation score in 2011. The second incident report listed several faculty members who the university should contact regarding their adverse treatment, but it never listed Yu. [*Id.*].

As a matter of law, the activity of filing an anonymous report (the first incident report) cannot be the basis for a retaliation claim. The report cannot be retaliated against if the Defendants did not know who submitted the incident report and, therefore, did not know against whom to retaliate. Additionally, the second incident report did not ever mention Yu and cannot be the basis of a retaliation claim.

Third, Yu filed his charge with the EEOC on November 5, 2012 and received his notice of right to sue on July 25, 2016. [Doc. No. 1, Ex. A]. He was one of three Chinese faculty members who submitted similar claims of national origin discrimination at the hands of Niroomand. This is a protected activity as a matter of law and will be discussed by the Court in more detail below.

Fourth, Yu contends that he engaged in protected action by refusing to sign an alleged loyalty oath in November 2011. Neither Party has submitted summary judgment evidence confirming the existence or the exact contents of the loyalty oath. In his deposition, Yu described an email circulated in November 2011 from several faculty members asking the remaining SBA faculty to "sign a loyalty breach [sic] to support dean, to support school administrator." [Doc.

No. 34-2, Ex. 6 at 107:15-17]. In an unsworn copy of Yu's anonymous incident report, Yu described the email as containing a request to sign a pledge "to work with administration" and "supportive of SBA administration." [Doc. No. 39-11, Ex. I]. This unsworn hearsay document also alleges that although individual faculty members sent the pledge email, Yu believed school administrators were behind the effort. [*Id.*].

Yu explained in his deposition that he was uncomfortable signing the pledge, which reminded him of loyalty papers to Chairman Mao during the Chinese Cultural Revolution. He made a comment along these lines to other faculty at a holiday party in 2011. [Doc. No. 34-2, Ex. 6 at 107:20-108:5]. Yu did not sign the pledge. [*Id.* at 107:18-19]. He claims that about three months later, Niroomand said Yu had "bad-mouthed" him at the party by comparing the loyalty pledge to Chairman Mao. [*Id.* at 108:6, 23-25]. Yu also claims that in September 2012, Niroomand said he would "deal with [him]" because of the "bad-mouthing." [*Id.* at 112:4-8; Doc. No. 39-15, Ex. M (EEOC Complaint)]. Although there are few "facts" regarding these alleged events that are actually in admissible form, the Court assumes that Yu's activity in refusing to sign the pledge was protected for purposes of his Title VII retaliation claim.

The Defendants have not contested in this regard that Yu engaged in protected activities. Instead, Defendants argue that Yu cannot meet the second or third elements of his Title VII prima facie case because he did not suffer an adverse employment action and any negative actions were not causally linked to his engagement in protected activities.

     *i.* *Causal Links Between the Protected Activity and Adverse Employment Action*

        1. Failure to Promote

As previously described, Yu did not apply for promotion to full professor in 2012; he described beginning the application process in 2009, 2010, and 2011, and withdrawing each application. [Doc. No. 39-14, Ex. L at 15:20-16:2, 16:8-20, 24:20-22]. Yu contends, however, that his 2013 application for promotion was rejected because he engaged in protected actions before submitting the application, namely that he refused to sign the loyalty pledge in November 2011 and that he filed an EEOC charge in November 2012. He alleges that Niroomand's influence on each step of consideration prevented him from being advanced. [*See id.* at 59:2-20].

The Court notes at the outset that the alleged adverse employment action discussed here falls outside of the actionable time period for Yu's exhausted claims. The Court previously noted that some courts within this Circuit will not consider retaliation claims tied to an unexhausted discrimination claim. *See Sapp v. Potter*, 413 F. App'x 750, 752-53 (5th Cir. 2011); *Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 273-74 (5th Cir. 2013). This Court need not answer whether unexhausted retaliation claims arising out of the EEOC claim can be separately evaluated after *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Instead, assuming the most favorable scenario to the non-movant, the Court will consider the circumstances regarding Yu's 2013 promotion rejection. Indeed, there is no need for the Court to decide the exhaustion issue as the Court finds that the alleged adverse employment actions are not causally linked to Yu's protected actions.

Yu actually applied for promotion to full professor in the fall of 2013, at which time his application went through the standard procedures for consideration at UHV. [*See* Doc. No. 34-4, Ex. 28]. The summary judgment evidence shows that Yu's application materials were considered by several groups and individuals before arriving at Niroomand's desk. The Defendants' records of Yu's application records demonstrate that his application was considered by a School

Advisory Committee (SAC), the SBA Promotion Committee, his Department Chair, four external reviewers, and Dean Niroomand before being forwarded with a negative recommendation to the provost. [*Id.*]. The subsequent steps included consideration by the university's Promotion & Tenure Committee and the provost; neither party submitted evidence regarding those final steps.

The SAC committee—the first step in the promotion consideration process—consisted of Drs. Glasure, Ramamoorthy, and Swaidan, and they found that Yu's teaching and service qualifications were sufficient, but they described his "research performance as not meeting the level required or expected for promotion as per FDEP." [Doc. No. 34-4, Ex. 28]. Then, the SBA Promotion Committee, a different deliberative body, voted against Yu's promotion. [*Id.*]. Thereafter, Yu's department chair, Stephanie Solansky, separately suggested that Yu not be recommended based on his lack of research and publications in his teaching area. [*Id.*]. She noted that while Yu was qualified in every other area, his publications were not rated as quality or higher according to FDEP 2011, he had not published enough as a primary author, and he had not published sufficiently in topics related to his teaching area. [*Id.*].

The four external reviewers, who were asked by Niroomand to review Yu's application materials, did not know Yu and taught at other universities.[15] Their evaluations yielded mixed results: Two recommended that Yu be promoted, and two recommended that he not be promoted based on his lack of research in his teaching areas. [Doc. No. 34-4, Ex. 28]. One voiced his reservations about promotion because most of Yu's articles since 2007 had been published in the field of management information services rather than management or international business, which the evaluator noted was out of line with UHV's promotion and tenure rules. [*Id.*]. The

---

[15] These other faculty members teach at the University of Texas at Tyler, Mississippi State University, and California State University, San Marcos.

other evaluator that recommended against promotion noted Yu's lack of primary authorship and the lack of publications within Yu's teaching area. [*Id.*]. Even one of the favorable evaluators noted that Yu published predominantly in management information systems without a history of teaching in that topic, but concluded that Yu's publication history demonstrated an ability to collaborate and publish high quality articles frequently. [*Id.*]. The remaining evaluator recommended promotion—"I would vote to give him a tenured[16] full professorship given the number of articles with which he has been involved, their importance to the field of business and management, and his strong background in methodology and statistics"—but did note that Yu was only primary author on one article. [*Id.*].

After all of these steps, Niroomand sent a letter to the provost and University Promotion and Tenure Committee compiling these evaluations and with his own recommendation that Yu not be promoted. [*Id.*]. Niroomand carbon copied Yu. In his letter, Niroomand explained:

> The criteria for promotion to full professor, as specified in the SBA's Tenure and promotion Document that has been in effect since 2011, clearly state that "all articles must be in the faculty's teaching area and only one of the articles can be in a multidisciplinary area related to faculty's teaching field." The lack of support for Dr. Yu's promotion at this time at every stage is due to not fulfilling such a requirement. Dr. Yu has been warned and encouraged by various evaluation committees and administrators since 2010 to publish in high quality journals in his discipline and teaching area in order to receive the necessary vote and support for his promotion to the rank of full professor. In fact he applied for promotion twice in the past three years and withdrew both times based on the unanimous recommendation of the SAC.

[Doc. No. 34-4, Ex. 28].

Yu responded to Niroomand's letter contesting the majority of Niroomand's assertions, in particular whether Niroomand followed the appropriate procedure for submitting a negative recommendation, whether the FDEP 2011 was applied retroactively in an improper way, how to

---

[16] Uncontested summary judgment evidence demonstrates that Yu had already received tenure upon his promotion to associate professor. The promotion for which Yu was applying involved a title change, to full professor, but would not change his tenure status.

define Yu's teaching area for purposes of counting his publications toward promotion requirements, and whether Yu had qualifications comparable to other faculty who were successfully promoted. [Doc. No. 39-12, Ex. J]. Yu has not offered proof of the authenticity of these documents, which accordingly are hearsay. He simply supplied a copy of the alleged email thread between him and Niroomand.

In his email to Niroomand, Yu first argues that Niroomand violated school policy by sending the negative recommendation without first allowing Yu 7 days in which to respond. Yu provides an excerpt that he claims is from the faculty handbook (Yu did not provide any proof of authenticity for this excerpt), in which the handbook appears to state that faculty members should be informed immediately of any negative recommendation regarding promotion, and upon request, be given 7 business days to "request reconsideration by the denying entity and an opportunity to be heard informally before the recommendation is forwarded." [Doc. No. 39-12, Ex. J]. Once again, this is hearsay. In response, the faculty member should provide a written statement for the basis of this request and whatever other evidence he/she believes is relevant for reconsideration. [*Id.*]. Yu did not indicate anywhere in this exhibit, or anywhere else, that he requested time to respond.

Yu's correspondence, dated November 25, 2013, suggests that Niroomand dated his negative recommendation on October 31 and sent it to the Provost and University Promotion and Tenure Committee on November 15, and that Yu received his copy on November 18. [Doc. No. 39-12, Ex. J]. Assuming these are the rules laid out in the faculty handbook, if Yu indeed requested time to respond, it is possible that Niroomand violated policy by not providing Yu an opportunity to request time to respond and file that response before forwarding a negative recommendation.

The question, therefore, becomes whether such a rule violation—if Niroomand sent the negative recommendation before Yu could respond—impacted the outcome in a manner that could demonstrate retaliation. In Yu's response on November 25, 2013, he provided a thorough explanation of the reasons for reconsideration and the evidence he considered relevant. [Doc. No. 39-12, Ex. J]. Yu submitted the same information to Provost Cass on March 25, 2014, suggesting that all relevant arguments and evidence in support of his promotion were included in both submissions. [Doc. No. 39-13, Ex. K]. In his March 2014 email, Yu further complained that Niroomand, the "School Committee," and UHV's Promotion and Tenure Committee each neglected to give him 7 days to clarify the information. [*Id.*]. However, Yu and Niroomand both acknowledge, in their email correspondence regarding Yu's explanations for reconsideration and qualifications, that Yu's evidence and arguments were emailed to the full committee for their consideration. [Doc. No. 39-12, Ex. J]. There is no evidence or suggestion that the full committee disregarded or failed to consider this information.

In response, Provost Cass informed Yu that he was willing to give him an opportunity for reconsideration at the provost's level, despite the fact that the time for reconsideration had elapsed. [*Id.*]. The provost noted that Yu had not submitted the materials properly and told him to resubmit them in writing for the official record so they could be considered. [*Id.*]. The provost's letter noted, however, that the faculty handbook would not allow for additional appeals past that point, as the promotion consideration process would close after three negative recommendations. The provost wrote that Yu could either pursue reconsideration or would be allowed to withdraw his application to avoid a negative formal outcome. [*Id.*]. Yu's March 25, 2013 letter shows that Yu continued to seek promotion. The Defendants have also submitted

records showing that Yu requested reconsideration of his denial in March 2014, which was denied by Provost Cass [Doc. No. 34-4, Ex. 30].[17]

Thus, even if Niroomand did not provide Yu with time to respond in the promotion process, the record shows that Yu received separate reconsideration by Niroomand's superiors who had access to Yu's arguments, evidence, and rebuttals. It is clear that UHV gave full consideration to all of Yu's arguments and evidence because Provost Cass stepped in during the original application and reconsideration processes. Consequently, even if this Court were to consider the hearsay evidence, which it cannot, the evidence raises no issue of material fact concerning a failure to promote in retaliation for engaging in protected activities.

Next, Yu argues that Niroomand improperly applied FDEP 2011 standards retroactively to disqualify his publications from consideration. It appears from the evidence that FDEP 2011 was voted on by the SBA faculty and approved by an accrediting body.[18] [Doc. No. 34-3, Ex. 14]. The FDEP 2011 states regarding annual evaluations:

> Carryovers from previous years: The previous 5-year carryover rule applies to articles published in the year 2010 and before and journal points for the same will be awarded accordingly. *Faculty with carryovers from previous years will have a choice to rank the journal articles using the previous FDEP or the current document. However, if one chooses the current document, the points earned from those articles must be used according to this document guideline.*

[Doc. No. 34-3, Ex. 13 (emphasis added)]. Yu's 2013 annual evaluation shows that Yu selected the FDEP 2011 to apply for his evaluation, which Yu did not contest. [Doc. No. 34-3, Ex. 12]. Yu's annual evaluations show that in 2013 he was informed that he needed to publish an additional article in order to retain his academically qualified status in 2014. [*Id.*].

---

[17] Competent summary judgment evidence demonstrates that Yu's claims also include a 2017 application for promotion, which was denied after consideration by UHV SBA's Interim Dean, who succeeded Niroomand. [Doc. No. 34-4, Ex. 25]. Because Yu did not amend his EEOC charge to include this 2017 application, he has not exhausted this claim and it will not be considered by the Court.

[18] Although it is unclear from the summary judgment evidence when this vote and approval process occurred, the Defendants submitted a copy of FDEP 2011 as a business record. [Doc. No. 34-3, Ex. 13]. The title identifies FDEP 2011 as becoming effective spring of 2011 and mentions "SBA Policy Review Committee (Fall 2009)." [*Id.*].

Yu next contends that the failure to promote him should be considered retaliatory because he was more qualified than other similarly situated candidates who were promoted. In his deposition, Yu testified that he was more qualified for promotion than four other candidates who were ultimately promoted: Joseph Urben, Linda Hayes, Ziad Swaidan, and Penny Cloninger.[19] [Doc. No. 34-2, Ex. 6 at 129:1-130:6]. No one has provided evidence concerning a Dr. Urben, so the Court can only consider the other individuals. In his summary judgment evidence, Yu does not describe what subjects or how many classes these individuals taught, how many or what quality publications they had at the time they were promoted, or what the recommendations were for each of these individuals as they went through the promotion consideration process at UHV. Yu references unnamed marketing faculty who were promoted, but he does not provide information about the order of authorship of their publications, the quality of journals in which they published, or even an indication of whether the articles he listed are their complete list of publications leading up to their consideration for promotion. [Doc. No. 39-12, Ex. J]. Yu only provides his (hearsay) email to Niroomand in which he says these two unnamed marketing professors also had some publications in journals unrelated to marketing. [*Id.*]. While the records of courses taught at UHV SBA during 2012 and 2013 show that Dr. Hayes and Dr. Swaidan both taught courses related to marketing, Yu did not explain if these were the professors in question.

Although it is not their burden, the Defendants' uncontested summary judgment evidence provides little additional insight. The records of Yu's promotion process show that the same SBA promotion committee that voted to not promote Yu did recommend promoting Dr. Cloninger by a vote of 4 Yes, 2 No, 3 Abstain. [Doc. No. 34-4, Ex. 28]. The evidence provides no further information allowing for comparison of similarly situated faculty members.

---

[19] Uncontested university records show that Dr. Cloninger is from the United States and Dr. Swaidan is Palestinian. [Doc. No. 34-1, Ex. 2]. The record does not indicate the national origin of Dr. Hayes.

There is some evidence, however, indicating that some of these faculty members against whom Yu compares himself were also engaging in the same protected behaviors. For example, both Cloninger and Swaidan had points removed from their 2011 faculty evaluations by Niroomand and neither signed the loyalty pledge that had circulated in 2011. [*See* Doc. No. 39-11, Ex. I]. The MySafeCampus report, which Yu anonymously filed with other Chinese faculty members, cited both actions affecting Swaidan and Cloninger as examples of other alleged forms of retaliation, e.g., Swaidan not receiving travel funds and Cloninger losing her position on the Dean Search Committee. [*Id.*].

The most one can conclude from the actual summary judgment evidence provided is that other faculty members who did not sign loyalty pledges and who were mentioned in internal complaints, both protected activities in which Yu also participated, were promoted while Yu was not. This does not create an issue of material fact as to retaliation in denying Yu promotion.

2. Failure to Give Pay Increases

Yu also claims that he received low evaluation scores, and correspondingly low pay increases, as retaliation for engaging in protected activity, e.g., not signing the loyalty pledge in November 2011 and filing an EEOC charge in November 2012. The following table outlines Yu's evaluation scores and merit pay increases from 2009 to 2017, the years that Niroomand was SBA dean:

| Year | Yu's Composite Evaluation Score | Yu's Merit Increase (%) |
|------|---------------------------------|-------------------------|
| 2009 | 4.7 | 2.8861 |
| 2010 | 4.62 | 2.92 |
| 2011 | 4.08 (raised in 2012 to 4.50) | 1.90 |
| 2012 | 4.01 | None given |
| 2013 | 4.2 | 3.20 |
| 2014 | 4.1 | 2.0 |
| 2015 | 3.75 | --[20] |

[20] Neither Party submitted evidence of Yu's merit pay increase in FY 2015.

| 2016 | 3.9 | 1.75 |
| 2017 | 4.43 | None given |

[Doc. No. 34-1, Exs. 11, 12, 14; Doc. No. 39-3, Ex. A].

Yu specifically contends that his evaluation score in 2011, dated March 30, 2012, was lowered at Niroomand's discretion. [Doc. No. 34-3, Ex. 11]. He alleges, but provides no evidence to the effect, that the dean's discretionary adjustment negatively impacted his service component and that Niroomand deducted points from his score because he and several other Chinese faculty members did not attend the 2011 commencement ceremony. [Doc. No. 39-15, Ex. M]. Niroomand acknowledged in his affidavit that he used discretionary deductions to lower Yu's score for failure to attend commencement, along with other faculty. [Doc. No. 34-1, Ex. 3]. In August 2012, however, the SBA reset the faculty evaluation system scores to retroactively eliminate the dean's scores from the final 2011 evaluation scores. [Doc. No. 34-3, Exs. 24, 26]. As a result, Yu's 2011 evaluation score increased from 4.08 to 4.50. [Doc. No. 34-3, Ex. 26].[21]

In the years following, Yu's performance evaluations were prepared by Xavier Garza-Gomez, his department chair. [Doc. No. 34-3, Exs. 11, 12]. Yu claims in his deposition (without a basis) that Niroomand influenced or instructed Garza-Gomez to give him low evaluation scores, but he did not present any summary judgment evidence to support this claim. In Garza-Gomez's affidavit, he denies receiving any instructions regarding evaluation scores from Niroomand, and he takes full responsibility for the evaluation scores from 2012 to 2017 [Doc. No. 34-1, Ex. 5].

Yu contends, however, that these actions nevertheless hide Niroomand's underlying retaliatory intent. Yu's briefing suggest that the timing of Niroomand's reduction of Yu's 2011

---

[21] Specifically, Yu's service component score was raised from 3.15 to 3.36 without the Dean's discretionary points. While Yu's complaint revolves around the Dean's deduction for not attending commencement, which only affected his service component, it is worth noting that the revision to his FDEP 2011 evaluation also increased his research score from 4.0 to 5.0. [Doc. No. 34-3, Ex. 26].

evaluation score is suspect because it followed Yu's in-person complaint to the provost in summer of 2011 and his refusal to sign a loyalty pledge in November of 2011. He also claims that the subsequent low merit pay increases resulted from his MySafeCampus report in April/May of 2012 and EEOC charge in November of 2012. As the Court has previously explained, neither the in-person complaint in the summer of 2011 nor the anonymous MySafeCampus incident reports can be the basis for a retaliation claim as a matter of law. The Court analyzes Yu's retaliation claims, therefore, only with regard to his refusal to sign a loyalty pledge and his EEOC charge.

Yu has submitted no evidence to support his claims. He does not cite to any specific evidence in his briefing to direct the Court's attention to supporting facts. His deposition testimony includes the following conclusory and unsubstantiated statement:

> Q:  Okay. And if there had been any decision with respect to promotion, your consideration for promotion to full professor, pay raises, salary, anything of that sort, it's your position in this lawsuit that either it was Dr. Niroomand that discriminated and/or retaliation against you or that he influenced others to make a decision adverse to you, is that correct?
> A:  Yes.

[Doc. No. 39-14, Ex. L at 97:3-10]. The remainder of Yu's evidence is limited to similar conclusory statements in hearsay documents, which cannot be considered by the Court.

Accordingly, the summary judgment evidence fails to show any causal relationship between Niroomand's statements and actions and a negative effect on Yu's pay. Yu has not presented evidence that Niroomand's participation negatively impacted his 2011 evaluation score as Niroomand's adjustments were removed. Additionally, since Yu filed his EEOC charge in November 2012, months after the 2011 evaluation was prepared and rescored, the timing eliminates the possibility that a retaliatory motive resulting from his 2012 EEOC charge could have impacted the 2011 score in question.

The Court turns to the summary judgment evidence regarding Yu's pay and merit increases during the actionable time frame to determine if Yu was adversely affected. Again, Yu only provided unsworn documents regarding his pay from FY 2014 to 2017. [Doc. No. 39-10, Ex. H]. Defendants have provided uncontroverted evidence of the base pay and merit pay increases awarded between FY 2008 and FY 2015. [Doc. No. 34-3, Ex. 19]. As previously noted, Yu filed his EEOC claim in November of 2012, and his grievance regarding the 2011 faculty evaluations in the summer of 2012. The only year within the statute of limitations is FY 2012. Nevertheless, because pay for FY 2013 was determined soon after Yu's alleged protected activities, the Court considers that year to the extent that it can show retaliation arising out of Yu's actions in 2012.

Considering all of the summary judgment evidence, there is not an issue of material fact for retaliation for FY 2012 for several reasons. First, the fiscal year runs from September to September, so Yu's protected activity in November 2012—filing an EEOC claim—occurred after merit pay increases were already determined in September for FY 2012 based on his 2011 FDEP evaluation score. The Defendants cannot have retaliated in September of 2012 for an event that occurred two months later in November of 2012. Second, the Defendants provided uncontroverted evidence that **no** faculty member received a merit pay increase in FY 2012 because there were no funds to distribute that year. Third, the Parties agree that Yu's 2011 evaluation, upon which any merit pay increases would have been based, was retroactively raised in order to eliminate any deductions from the dean's discretionary points. In fact, the evidence shows the revised 2011 rating to be one of the best Yu ever received. The facts simply cannot support a finding of retaliation in that year.

Turning then to FY 2013, the fiscal year after which Yu filed his EEOC claim, the facts demonstrate that Yu received a 3.20% merit pay increase, which was higher than 18 other faculty members (out of 39 total). The pay records show that Yu's merit raise was tied at 3.20% with 8 other faculty members, and less than only 11 faculty members. [Doc. No. 34-3, Ex. 19]. The higher paid faculty members were White (3), Middle Eastern or Indian (4), Hispanic (1), and Chinese (3). [*Id.*]. Furthermore, the pay records show that FY 2013 was the highest merit pay increase that Yu had ever received since Niroomand became dean in 2009, as his previous rates were 2.8861% in FY 2009, 2.92% in FY 2010, 1.90% in FY 2011, and 0.00% in FY 2012 (because of no funding). [*Id.*]. It is also higher than all of his subsequent raises in evidence.

Yu's merit pay in FY 2013 was also higher than the other Chinese faculty members who also received deductions for failure to attend commencement, refused to sign the loyalty pledge, and filed an EEOC charge in November 2012: Yu (3.20%), Ren (2.50%), and Du (0.00%). [*Id.*]. Yu's merit pay in 2013 was also as high or higher than two of the three faculty members who reportedly sent the email asking SBA faculty for loyalty to the administration: Solansky (4.00%), Yu (3.20%), Ben-Ur (3.20%), and Salazar (2.50%). Yu's actual take-home pay in 2013, after the merit increase, was higher than two of the alleged loyalty oath email authors, as well: Solansky ($101,511.60), Yu ($94,906.83), Ben-Ur ($93,261.55), and Salazar ($91,199.36). [Doc. No. 34-3, Ex. 19].

The evidence in the record fails to raise an issue of material fact regarding whether Yu received low evaluation scores and low pay increases in retaliation for participating in protected activities.

### 3. Other Allegedly Retaliatory Actions

Yu contends that other adverse employment actions were taken in retaliation for his refusal to sign a loyalty pledge and decision to file a complaint through the EEOC; these include awarding lower travel funds compared to other faculty members and requiring him to teach at UHV's Victoria campus.

*Travel Funding*

In resolving a motion for summary judgment, the Court is limited to evidence provided. The Court starts with the issue of travel funding awarded by the SBA for academic conferences and presentations. Yu's evidence regarding travel funds awards only includes hearsay records regarding a Decision Sciences Institute 2010 annual meeting in San Diego, California, for which he was awarded $1,100.00, while a junior faculty member from Nepal was awarded $1,400.00. [Doc. No. 39-6, Ex. D]. This allegation, in addition to being unsworn and not otherwise proven, is barred by the statute of limitations and is therefore not actionable.

With regard to travel funding requested in other years, Yu has submitted no proof whatsoever, while Defendants have submitted records of Yu's funding amounts in comparison to other faculty members. Defendants' uncontested evidence includes the Guidelines and Procedures Concerning SBA Funding for Faculty Travel to Academic Conferences and Seminars 2011-2012 Academic Year. [Doc. No. 34-2, Ex. 20]. It describes how the SBA utilized a tiered funding system, with ranges of available funds within each tier; the tiers are determined by the quality of the conference, with the highest being for premier, peer-reviewed conferences. The actual funding award (within the range for that given tier) would be ultimately determined by the dean on a "case-by-case" basis. [*Id.*]. Several considerations for the funding amount include whether the applicant is the first or presenting author, past funding received, faculty production, and the "best interests of the SBA." [*Id.*]. The document notes that as a guiding principle,

"factors such as the career stage of the faculty member, one's [academically qualified] status, and the subsequent impact of the activity on [school] accreditation are pertinent issues. For example, from a larger perspective, the same conference might be more valuable to a junior faculty member as compared to a senior faculty member." [*Id.*].

Although Yu disputes how many and the value of travel awards he received in comparison to other faculty members, he did not dispute the applicability of the SBA guidelines, and more importantly he did not submit evidence of his travel awards after participating in protected actions. Without evidence to show that his travel funds were changed after filing his EEOC complaint, there can be no material issue of fact regarding a retaliation claim because it is not clear that an adverse employment action occurred. Unsubstantiated claims are insufficient at the summary judgment stage.

*Teaching Location Assignment in Spring 2013*

The Court next turns to Yu's Title VII retaliation claim regarding his teaching location assignments. Yu alleges that the Defendants retaliated against him by requiring him to teach at the UH Victoria campus after he filed his EEOC claim and grievance regarding the 2011 faculty evaluations. Yu alleges that this assignment to teach at the Victoria campus of UHV was retaliatory because of its timing and the fact that the other two Chinese faculty members, who were assigned to teach multiple face-to-face courses at multiple campus locations (Drs. Jianjun Du and Louie Ren), also complained internally to Provost Cass regarding the 2011 faculty evaluations and each filed an EEOC complaint in November 2012. [*See* Doc. No. 39-15, Ex. M]. (The Court cannot help but note that Yu, who is voluntarily a faculty member at the University of Houston-Victoria, is complaining that in all his years there he has had to teach one class in Victoria.)

In support of his claims, Yu submitted an unsworn "Self-Analysis Narrative and Documentation" that listed his course locations from 2005-2012, indicating that he had only taught at the Sugar Land and Cinco Ranch locations up to 2012, as well as through online courses [Doc. No. 39-3, Ex. A]. Yu also included an unauthenticated email from Provost Cass informing him of his assignment to teach at the Victoria campus [Doc. No. 39-7, Ex. E]; the Defendants, however, provided a proven copy of this record. [Doc. No. 34-4, Ex. 24].[22] Yu also submitted his written rebuttal to Defendants' EEOC response, which is hearsay.

The Defendants provided several responses to Yu's claims. First, Defendants refer to the university system's guidelines for course assignments and claim that these were applied uniformly to all faculty. [*See* Doc. No. 34-4, Ex. 22]. Among the reasons to be considered in determining faculty location assignments are focus on student needs, faculty workload, "maintaining a sizable residential – face to face – student body" in Victoria, and offering students "the opportunity to take face-to-face classes, rather than online, over a sizeable period." [*Id.*]. Deployment assignments refer to teaching locations at the several UHV campuses. The Cass email informing Yu of his location assignment reiterated these concerns and included several additional reasons for the assignment, such as maintaining its "[Academically Qualified]/[Professionally Qualified] ratio" because "UHV needs to cover this class with a management faculty with a Ph.D." and following Yu's contract, which "indicates that [Yu] may be expected to teach at different sites," and "you certainly have not done so for many years." [Doc. No. 34-4, Ex. 24]. The faculty handbook also discusses the need for the Academically Qualified to Professionally Qualified ratio. [*See* Doc. No. 34-4, Ex. 22].

---

[22] The text of the email suggests the university was aware of Yu's opposition to teaching at Victoria: "All of us have been given courses in our careers that we would have preferred not teaching, but assigning classes is not just about your preferences, it is about the students' needs and the needs of the school to execute its strategic initiatives. In this case, that means you teaching in Victoria during the Spring 2013 semester." [Doc. No. 34-4, Ex. 24].

Second, Defendants contest Yu's claim that he, Du, and Ren were the only faculty who were assigned to teach face-to-face courses at more than one campus location during a single semester. Defendants submitted uncontroverted evidence of the course assignments from Fall 2011, Spring 2012, and Spring 2013 showing several faculty members who had to teach in-person classes at more than one campus. [Doc. No. 34-3, Ex. 23]. These include Drs. Y. Lee (Victoria, Cinco Ranch, and Sugar Land, Fall 2011); Ren (Victoria, Cinco Ranch, and Sugar Land, Fall 2011); Reed (Victoria and Sugar Land, Spring 2012); Chiang (Victoria, Cinco Ranch, and Sugar Land, Spring 2012); Solansky (Victoria and Cinco Ranch, Spring 2012); C. Yang (Victoria and Cinco Ranch, Fall 2012); Swaidan (Victoria and Sugar Land, Fall 2012); Chiang (Victoria, Cinco Ranch, and Sugar Land, Spring 2013); and Rauniar (Victoria and Cinco Ranch, Spring 2013). [Doc. No. 34-1, Ex. 1].

Having offered a reasonable, non-discriminatory explanation for Yu's location assignments, the burden shifts back to Yu to demonstrate pretext behind these decisions. Again, however, Yu's only evidence submitted to the Court is his speculation that Niroomand influenced these decisions in order to retaliate and the bald assertion in his unsworn EEOC documents. [*See* Doc. No. 39-14, Ex. L at 89:19-23; Doc. No. 39-15, Ex. M]. Yu claims in his EEOC correspondences that comparisons to other faculty's location assignments are meaningless because several of the faculty assigned to teach at Victoria live near the location (Drs. Solansky and Chapa). [*See* Doc. No. 39-15, Ex. M]. This claim ignores the number of faculty listed above who were assigned to more than one off-home-campus location in the years leading up to 2013. It also ignores the fact that if Drs. Chapa and Solansky live near the Victoria campus, they had to travel to teach in Cinco Ranch or Sugar Land.[23]

---

[23] Dr. Chapa was assigned to teach in Sugar Land in 2011 and 2012. Dr. Solansky was assigned to teach in Cinco Ranch and Victoria in 2012. [Doc. No. 34-3, Ex. 23].

The uncontroverted evidence establishes that similarly situated faculty members who were not Chinese and who did not file EEOC claims have been assigned to teach at as many as three campuses for face-to-face classes in one semester. Furthermore, the fact that Dr. Ren—who also filed an EEOC charge, in-person complaint, and anonymous incident report, and refused to sign the loyalty oath—was not assigned to teach at Victoria in Spring 2013, undercuts Yu's claim that the teaching locations assignments made shortly after these protected actions were used in retaliation to punish those three faculty members.

In Yu's EEOC correspondences, which are hearsay and therefore not considered by the Court, he references an internal grievance that he filed regarding his teaching location assignment in Spring 2013. Yu claimed that the university, upon investigation of the teaching assignments, found a "lack of transparency and protocol for faculty teaching assignments." [Doc. No. 39-15, Ex. M]. He claims that Niroomand publicly shamed him for grieving the location assignment in an email sent to the rest of the faculty. [*Id.*]. Yu has not submitted any supporting evidence, such as the records of the grievance process or the email allegedly sent by Niroomand.

Finally, the Court notes that timing alone does not support Yu's claims of retaliation. Yu filed his EEOC complaint three days after he was informed of his Spring 2013 course assignment in Victoria, so the assignment could not have been in retaliation for that protected action. [*See* Doc. No. 1, Ex. A; Doc. No. 39-15, Ex. M]. Yu's refusal to sign a pledge of loyalty, based on the limited evidence before the Court, appears to be the most distant in terms of time elapsed: The alleged loyalty email was circulated on November 21, 2011, while the course assignments were distributed on November 2, 2012. [*See* Doc. No. 39-11, Ex. I]; *see Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (10-month lapse "suggests that a retaliatory motive was highly unlikely").

Based on the summary judgment evidence properly before the Court, Yu has failed to raise an issue of material fact demonstrating pretext behind the Defendants' actions in assigning him to teach a course at the Victoria campus of the University of Houston at Victoria.

## V.    Conclusion

Having reviewed the applicable law and properly submitted summary judgment evidence presented by the Parties, the Court is persuaded that there are no outstanding issues of material fact to present to a finder of fact regarding Plaintiff's Title VII discrimination and retaliation claims. Furthermore, even if the Court considered the purported "evidence," which was not properly proffered, it would still find no issues of material fact exist. The Court accordingly **GRANTS** Defendants' Motion for Summary Judgment [Doc. No. 34] and **DISMISSES** this case **WITH PREJUDICE**.

Signed this ⎽15⎽ day of February, 2019.

Andrew S. Hanen
United States District Court Judge